Raymond H. Lemisch, Esquire (I.D. No. 036501986)
Christopher J. Leavell, Esquire (I.D. No. 020342014)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
10000 Lincoln Drive East, Suite 201
Marlton, NJ 08053
Tel:  (856) 486-7900
Fax:  (856) 486-4875
Email: rlemisch@klehr.com
Email: cleavell@klehr.com
          AND
Gregory M. Williams (*pro hac* forthcoming)
Richard W. Smith (*pro hac* forthcoming)
**WILEY REIN LLP**
1776 K Street NW
Washington, DC 20006
Tel:  (202)719-7000
Fax:  (202)719-7049
Email: gwilliams@wileyrein.com
Email: rwsmith@wileyrein.com
          AND
Donald E. Stout (*pro hac* forthcoming)
**FITCH, EVEN, TABIN & FLANNERY LLP**
1250 23rd Street NW, Suite 410
Washington, DC 20037
Tel: (202) 419-7000
Fax: (202) 419-7007
Email: dstout@fitcheven.com

Attorneys for Plaintiff FASTSHIP, LLC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **FASTSHIP, LLC, and THE LIQUIDATING TRUST OF FASTSHIP, INC. ET AL.**<br><br>        **PLAINTIFFS,**<br>   v.<br><br>**LOCKHEED MARTIN CORPORATION, and GIBBS & COX, INC.**<br>**Jointly, severally, and in the alternative,**<br>        **DEFENDANTS.** | Civil Action No. 17-CV-02919 (NLH)(KMW)<br><br>**SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs FastShip, LLC and The Liquidating Trust of FastShip, Inc. Et Al. (collectively, "FastShip" or "Plaintiffs') bring this action against Defendants Lockheed Martin Corporation ("Lockheed") and Gibbs & Cox, Inc. (collectively, "Defendants"), and allege as follows:

## NATURE OF THIS ACTION

1.  This is an action for breach of contract and misappropriation of trade secrets arising from Defendants' breach of the parties' confidentiality and nondisclosure agreements and improper and unauthorized use of FastShip's trade secrets.

## PARTIES

2.  Plaintiff FastShip, LLC is a limited liability corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Philadelphia, Pennsylvania. FastShip, LLC is the assignee of FastShip, Inc., Thornycroft, Giles & Company, Inc. and FastShip Atlantic, pursuant to the terms of a confirmed plan of reorganization. Specifically, FastShip, LLC is the assignee of the claims at issue in this suit. The sole member of FastShip, LLC is Plaintiff The Liquidating Trust of FastShip, Inc. Et Al. (the "Liquidating Trust").

3.  Plaintiff The Liquidating Trust is a "traditional trust" within the meaning of *Americold Realty Trust v. ConAgra Foods, Inc.*, — U.S. —, 136 S. Ct. 1012 (2016). The Brownstein Corporation is the Trustee of the Liquidating Trust. The Brownstein Corporation is incorporated and has its principal place of business in Pennsylvania. The Liquidating Trust is also the assignee of certain assets and rights of FastShip, Inc., Thornycroft, Giles & Company, Inc., and FastShip Atlantic, Inc. pursuant to the terms of a confirmed plan of reorganization. Specifically, any assets of any kind or nature whatsoever, held by FastShip, Inc., Thornycroft, Giles & Company, Inc. and FastShip Atlantic, Inc. not assigned to Plaintiff FastShip LLC were

2

assigned to the Liquidating Trust pursuant to the terms of the confirmed plan of reorganization. The Liquidating Trust is added as a plaintiff in this suit out of abundance of caution. Plaintiffs understand and believe that FastShip, LLC has standing to bring this action.

4. Defendant Lockheed, one of the world's largest defense contractors, is incorporated in Maryland, with its principal place of business in Bethesda, Maryland.

5. Defendant Gibbs & Cox, Inc. ("Gibbs & Cox"), a naval architecture firm, is incorporated in New York, with its principal place of business in Arlington, Virginia,

## JURISDICTION

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are completely diverse and the amount in controversy exceeds $75,000.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## INTRODUCTION

8. A FastShip founder, technical director, and named inventor of the two patents described below, David L. Giles, developed a revolutionary new hull design — an enlarged semi-planing monohull ("SPMH") — that permits larger ships to achieve high speeds without sacrificing stability. For years, the Navies of Great Britain and the United States and naval architecture community generally rejected Mr. Giles' hull design as infeasible. FastShip spent approximately $40 million on computer simulations, tank tests, and other measures to prove the viability of Giles' SPMH concept.

9. Defendants signed nondisclosure and confidentiality agreements with FastShip, invited FastShip to join them in pursuing the U.S. Navy's Littoral Combat Ship ("LCS") Program to build large, fast, and seaworthy combat vessels, and specifically touted FastShip's trade secrets in their proposal for the LCS Program. Nevertheless, when Defendants won the

LCS contract, they did not include FastShip on their team. Moreover, rather than conducting their own extensive, expensive, and time-consuming tank testing, as the Navy would have required in the absence of FastShip's data, Defendants improperly relied on FastShip's tank tests and other trade secrets to secure and/or perform the LCS-related contracts, including to obtain U.S. Navy approval to proceed with the program. Defendants have received, or will receive, billions of dollars in revenues for their work on the LCS Program.

## BACKGROUND

### I. The SMPH Design

10. For both commercial and military purposes, there has been a need for large ships (*e.g.*, exceeding 200 feet in length and 2,000 tons' displacement) capable of maintaining higher speeds (*e.g.*, exceeding 40 knots) in heavy seas. Prior to the LCS Program, conventional wisdom in ship design was that large ships should use displacement hulls. Such hulls are known to be severely limited in reaching speeds in excess of 40 knots, as they generally must sacrifice seaworthiness and payload. Nonetheless, there had been great resistance from ship designers to accept anything other than displacement hulls for such ships.

11. Mr. Giles had long considered the problems of existing hull designs and brought to his study of the problem substantial knowledge and experience from his project design work in the aviation industry. He concluded that the solution to the problem would come from (i) the combination of an enlarged SPMH design, a hull form that was not uncommon for smaller vessels but had not been used for larger vessels, and (ii) the use of water jets (rather than propellers).

12. Mr. Giles tried vigorously to convince the navies of both Great Britain and the United States that the SPMH design can work for larger vessels. However, both countries'

navies and the naval architecture community in general rejected his ideas and adhered to the traditional belief that semi-planing monohull designs could not be scaled up to the size of ships under consideration.

13. For example, on October 17, 1988, a group led by Mr. Giles, on invitation by the Senate Armed Services Committee, proposed a research and development project for the U.S. Navy to develop large, fast, and seaworthy ships for sealift purposes. The Navy rejected the proposal, expressing disbelief and voicing harsh criticism.

14. In the face of overwhelming rejection and skepticism by two of the world's greatest navies, Mr. Giles established Thornycroft, Giles & Company Inc. in Virginia, in March 1988. Mr. Giles and his group continued developing the SPMH solution and filed for patent protection on the technology in the United Kingdom on October 11, 1989. The U.K. application eventually led to the issuance of U.S. patents 5,080,032 ("the '032 patent") and 5,231,946 ("the '946 patent") (collectively, "the Patents") claiming and disclosing the SPMH hull design for larger vessels. FastShip is the sole owner of the Patents.

15. The patented concept used the shape of the hull and placement of waterjets to provide lift for larger vessels to reduce resistance and thus achieve higher speeds without impairing stability or cargo capacity. The design allowed such higher speeds without the need to increase the vessel's length (which would have reduced seaworthiness and stability) or decrease its beam (which would have reduced stability and the available stern width for the installation of water jets), an accomplishment long considered the equivalent of "breaking the sound barrier" in aeronautical technology.

**II.     The Trade Secrets**

16. Nonetheless, the skepticism about the scalability of the SPMH design to larger vessels persisted. In the 1990's after issuance of the Patents, to address this skepticism and to meet the requirements for the construction of commercial vessels using the SPMH design, FastShip (subject to confidentiality agreements) paid the leading experts in the field for elaborate analysis and testing to prove the viability of the hull design, prepared extensive drawings to enable a shipbuilder to construct a SPMH vessel, and obtained "main drawing approval" from Det Norske Veritas, the leading international maritime certification body and classification society.

17. For example, FastShip engaged the Department of Ocean Engineering at the Massachusetts Institute of Technology ("MIT") to run computer simulations of the hull design using MIT's three-dimensional computational method known as SWAN for the prediction of the calm water resistance and seakeeping properties of ships.

18. A 1995 MIT study concluded "on the basis of the SWAN calm and rough water analysis of the F/S [FastShip] that the vessel is outstanding in all aspects of its hydrodynamic performance considered. Its remarkably low added resistance and modest ship responses, wave induced loads and relative motions notwithstanding the extreme speed and high sea state appear to be without precedence and point to the promise of the F/S [FastShip] as a vessel capable to maintain a speed nearing 40 knots in extreme North Atlantic sea states."

19. Similarly, FastShip engaged SSPA to conduct elaborate tank testing. SSPA — allied with the Chalmers Institute of Technology in Gothenburg, Sweden — is the leading testing facility in the world for advanced ship designs, generally, and for SPMHs fitted with the emerging propulsor technology of water jets, specifically. Tank testing — and, in particular, a specific type of testing known as propulsion testing — is critical to proving the viability of a new hull design.

20. SSPA conducted 15 separate tank tests (several of which were propulsion tests) using various models featuring different versions of the SPMH and under a variety of conditions spanning from calm waters to high seas and shallow waters to deep. Such tank testing is especially important for a revolutionary design such as FastShip's, and even more so for a vessel using water jets to assess whether the inlets of the water jets become exposed in rough waters and/or when maneuvering. Such exposure of the water jets can decrease efficiency and harm performance.

21. The type of tank testing SSPA conducted for FastShip is essential for meeting the requirements for constructing both commercial vessels, as FastShip planned to do, and military vessels, as Defendants ultimately did relying on FastShip's Trade Secrets.

22. FastShip paid approximately $40 million for these tests and data, which built upon earlier tank testing and other data FastShip developed in the 1980's. Collectively, all such testing and data in the 1980's and 1990's is referred to as the "Trade Secrets." The 15 SSPA tank tests are embodied in written reports, as are the earlier tank tests FastShip conducted on the SPMH design, the construction drawings, and most (if not all) of the other Trade Secret data. There is no ambiguity whatsoever as to the identity of the Trade Secrets, all of which relate to the viability of the distinct SPMH design.

23. FastShip maintained the Trade Secrets in confidence, only sharing with potential commercial partners under non-disclosure and confidentiality agreements. Although the Trade Secrets related to the patented SPMH concept, they are separate and distinct from that concept and were not disclosed by the Patents or otherwise.

### III. FastShip Shares the Trade Secrets with Defendants under Non-Disclosure Agreements

24. In 2001, initially in contemplation of potential commercial collaboration (at least from FastShip's perspective and ostensibly from Lockheed's perspective), FastShip and

Lockheed entered into a non-disclosure agreement ("NDA"). That anticipated collaboration included the Spanish shipyard Izar, with which FastShip also signed an NDA.

25. In February 2003, FastShip and Lockheed entered into a further NDA in connection with the possibility of collaborating on the U.S. Navy's LCS Program. That February 2003 NDA includes provisions specifying New Jersey for both choice of law and venue. That same month, February 2003, FastShip entered into a separate NDA with Gibbs & Cox. The NDAs were for the purpose of sharing information regarding potential collaboration on the LCS Program. The NDAs did not authorize or allow Defendants to use FastShip's Trade Secrets on the LCS Program without further written approval from FastShip, which was never provided and, of course, would not have been provided in the absence of compensation from Defendants for such use.

26. Lockheed and FastShip additionally entered into a series of agreements regarding potential commercial collaboration and other non-disclosure/confidentiality agreements.

27. Under the February 2003 NDA and other confidentiality agreements, FastShip shared its Trade Secrets, including its tank testing data, with the Defendants and Izar. Neither Defendant had any experience with large semi-planing monohulls, as FastShip had originated the concept and none had been constructed prior to the LCS Program. Indeed, Lockheed had no relevant naval architecture expertise and virtually no experience with ship design at all.

28. Prior to the 2003 NDAs, Lockheed initially pursued the LCS Program independently using a different hull form (a twin-hulled catamaran proposal). In October 2002, Lockheed withdrew that proposal, and joined forces with Gibbs & Cox, which was competing with a high-speed planing monohull design (which is also distinct from a SPMH).

29. In January 2003, the U.S. Navy greatly increased its operational requirements for the LCS Program. The lower speed and greater size, or displacement tonnage, needed to fulfill the new LCS operational requirements excluded the use of a planing hull and brought it within the universally-recognized length, displacement, and relative speed limits of the SPMH.

30. At that time, General Dynamics, the leading competitor for the LCS contract, was proposing an entirely different hull design (a triple-hulled, all-aluminum trimaran fast ferry) that, unlike the SPMH, was already in service. Faced with this competition, Lockheed was forced to provide a credible, novel, "revolutionary" design within a short timeframe.

31. On February 26, 2003, following the U.S. Navy's announcement of the new LCS operational requirements, Lockheed invited FastShip to give a detailed presentation on FastShip's SPMH technology. FastShip provided full details of the 1980's research and development project it had undertaken with a leading Scottish shipyard on a water-jet propelled SPMH design that met the requirements of the Navy's new requirements in almost every respect, and showed videos of the 1990's SSPA sea-keeping and propulsion tests.

32. Following the presentation, Lockheed verbally invited FastShip to participate in the LCS Program. Lockheed repeated that request in writing on March 10, 2003; and on March 20, 2003, FastShip agreed to be included in the Lockheed team for the LCS, which also included Gibbs & Cox and later Izar.

33. In March 2003, an announcement was jointly agreed in writing between FastShip and Lockheed to that effect. It stated that:

> Lockheed and FastShip, Inc. are parties to a Memorandum of Understanding dated November 2, 2001 relating to cooperation with respect to commercialization of vessels to be built to a patented design developed by FastShip, Inc. While this MOU relates primarily to the development of the TG770 [commercial] vessel, it also contemplates cooperation in marketing the

9

FastShip design to the U.S. Military.  Lockheed has determined that a variant of the TG-770 patented design and expertise developed by FastShip, Inc. in high speed ships may be applicable to the Littoral Combat Ship.  Lockheed desires to have access to FastShip, Inc.'s technology and technical expertise (1) to assist in responding to the RFP (Request For Proposals) and, (2) should the Lockheed team be selected as one of the preliminary design teams, for development of the preliminary design for the Littoral Combat Ship.

34. In that same letter, the parties agreed that Lockheed was permitted to include FastShip, Inc. as a participant on its team for purposes of responding to the LCS request for proposals.  Further, Lockheed and FastShip agreed that FastShip would provide Lockheed and Gibbs & Cox information, as requested, to help define FastShip's involvement on the Lockheed team.  The parties explicitly subjected all such information exchanged to the 2003 NDA, including the requirements that Lockheed obtain FastShip's written approval before disclosing its information to a third party.

35. In its submission to the U.S. Navy for the preliminary design contract for the LCS Program, Lockheed specifically extolled the importance of the FastShip Trade Secrets, stating:

> FastShip, Inc. is another design contributor to the Lockheed LCS Team.  They have invested $40M in the development of an advanced, 40 ton, 42-knot semi-planing cargo ship.  FastShip will contribute hydrodynamic test data and loiter speed roll-reducing technologies.  ***Their data provides a valuable independent check on the Team's analysis to ensure that all requirements are met.***

36. In that same proposal, Lockheed described FastShip's contribution to the team as "High Speed Hull Design Validation."  Given the revolutionary nature of the use of a SPMH for larger vessels, "hull design validation" was one of, if not the, most critical variable in winning and performing the LCS contract (as described below).

**IV.    Without Permission, Defendants Improperly Used the FastShip Trade Secrets on the LCS Program**

10

37. Despite the parties' agreements and Lockheed's statements to the Navy, when the Navy selected Lockheed to conduct the preliminary design work for the LCS Program on May 27, 2004, Lockheed did not include FastShip on its team. Neither did Lockheed include FastShip on its team for the subsequent design and build work Lockheed was awarded on the LCS Program. In fact, Defendants never paid FastShip a penny of compensation for the extensive cooperation and information FastShip provided, and never worked with FastShip for the commercial exploitation of its technology.

38. On information and belief, Lockheed did not breach the February 2003 NDA or misuse FastShip's Trade Secrets by including FastShip, LLC on the Lockheed Team in the proposal for the preliminary design contract for the LCS Program or extolling the virtues of FastShip's Trade Secrets in that proposal. Those actions were consistent with FastShip's agreements with Lockheed. Neither did Lockheed breach any agreements by ultimately failing to include FastShip on its LCS team.

39. However, after winning the preliminary design contract, Lockheed had to perform that contract and win and perform subsequent contracts for the design and build work Lockheed was awarded on the LCS Program. On information and belief, Lockheed and Gibbs &Cox used FastShip's Trade Secrets to perform the preliminary design contract and to win and perform the subsequent aspects of the LCS Program. Any such use of FastShip's Trade Secrets was without FastShip's permission and thus was a breach of the February 2003 NDAs with those parties as well as a misappropriation of FastShip's Trade Secrets.

40. Specifically, on information and belief, Defendants conducted extremely limited tank testing prior to constructing the LCS-1 and -3 vessels, including no propulsion testing at all on LCS-1. The U.S. Navy would not have approved the construction of the LCS vessels without

11

such testing, particularly given the use of a SPMH design that the Navy had indicated was not appropriate for vessels of the size used in the LCS Program. FastShip only learned of that lack of testing by Defendants after discovery was completed and reviewed in the patent case described below, which was not completed until less than three years prior to the filing of the complaint in this suit. Given the confidential and classified nature of the LCS Program, prior to that point, FastShip had no ability to discover that lack of testing, had no other basis for suspecting that Defendants had improperly used FastShip's Trade Secrets, and had no basis for asserting a breach of contract, misappropriation of trade secrets, or other claim against Defendants.

41.     Moreover, the limited testing that Defendants did conduct on the LCS Program is largely directed to a "gap" in FastShip's testing from the Defendants' perspective, *i.e.*, testing relating to conditions for which FastShip did not test. Thus, the testing that Defendants conducted strongly supports the conclusion that Defendants relied on FastShip's tank testing to prove the viability of the LCS design generally and, to the extent that they conducted their own testing, it was primarily to address conditions FastShip had not tested.

42.     The "gap" in FastShip's testing was due to the nature of the FastShip commercial project. FastShip's testing related to a commercial ship that was larger than the LCS vessels. As a result of this larger-sized vessel, it was not necessary to test the FastShip SPMH design in very calm waters. Such waters would not effect a large vessel. The small, military LCS vessels, however, could be effected by such waters, particularly in connection with "underway replenishment" (fueling at sea) when the vessel must remain very steady. Because the question regarding the viability of the SPMH design was whether it would scale up to larger ships, FastShip's testing was directly relevant to the viability of the smaller LCS vessels. However,

because FastShip had not tested its larger ship in very calm waters, Defendants had to conduct such testing themselves.

43. That Defendants did not conduct the extensive tank tests that the U.S. Navy typically requires for a new hull design, particularly when the LCS used a hull design that was not only previously unused, but also previously rejected by the Navy, strongly suggests that Defendants improperly relied on FastShip's testing in connection with the LCS Program. That the limited testing Defendants did conduct was directed at calm water conditions for which FastShip did not test further strengthens that conclusion.

44. Based on the strong evidence that Defendants used FastShip's tank testing data, FastShip believes, and therefore avers, that Defendants likely used its other related Trade Secrets.

45. FastShip has separately filed a patent suit against the U.S. Government under 28 U.S.C. § 1498 based on the LCS-1 (and the LCS-3, although the Court of Federal Claims determined that the LCS-3 was not sufficiently completed at the time of the expiration of the Patents to infringe). On April 28, 2017, the Court found that the LCS-1 infringed the FastShip Patents, thus rejecting the false assertion that the Lockheed LCS vessels are not based on FastShip's hull design. In doing so, the Court emphasized the novelty of the hull design, specifically noting the U.S. Navy's initial rejection of the enlarged SPMH concept and success of that design in practice (once Defendants improperly used it without FastShip's permission).

46. FastShip's (now confirmed) suspicion that Defendants had used FastShip's patented design for the LCS vessels provided no basis for bringing a claim for breach of the NDAs or misappropriation. The patented design was not a trade secret. It was publicly available. Moreover, Defendants' infringement of the FastShip patents did not indicate

13

Defendants had misused FastShip's Trade Secrets. Patent and trade secret law protect different types of intellectual property. For example, Defendants use of FastShip's patented design did not indicate that Defendants used FastShip's tank testing on the LCS Program or that Defendants did not conduct their own full battery of tank testing.

47.     Further, Defendants concealed their improper use of FastShip's Trade Secrets. For example, after FastShip questioned Lockheed about the design of the LCS, Mr. Robert Regensburger of Lockheed stated in writing on June 21, 2004 that the LCS ship design was a multi-chined hull and, in essence, was not based on FastShip's hull design.

48.     Specifically, Mr. Regensburger stated: "I requested that LM's LCS team identify its hull design origins and confirm that no data rights issues exist with respect to patents held by FSI … Amplifying further, Lockheed's LCS Program Management and Staff representatives confirm that the origin of their hull configuration is based upon an integration of several designs with lines developed by Donald Blount & Associates. Further, the LCS team advises that design lineage also comes from Destriero, sharing certain features incorporated in advanced Italian ferry designs." "While both FastShip and Lockheed's LCS hull designs are recognized and commonly identified as semi-planing monohulls, notable differences do exist. By way of example, the LCS design is a multi-chined hull as compared to FastShips round-bilge configuration. The Lockheed LCS team is confident in their conclusions that given the technical differences between our respective designs, that no data rights exist."

49.     In the patent suit, the U.S. Government continued to advance Defendants' false argument that the Lockheed LCS vessels are based on different hull forms than FastShip's SPMH design. If the LCS vessels were not, in fact, based on FastShip's SPMH design, FastShip's tank testing and other Trade Secrets would (likely) not have been relevant to the LCS

14

Program, and FastShip would have had no reason to suspect, let alone know, that Defendants had improperly used FastShip's Trade Secrets in connection with that Program. It was only in the course of the patent litigation that FastShip gained access to the information that confirmed that the LCS vessels are based on the FastShip's patented SPMH design.

50. Similarly, Defendants represented to FastShip that they were conducting their own tank tests. Specifically, in September 2004, FastShip reached out to Ben Capuco of Gibbs & Cox to ask whether Defendants wanted FastShip's assistance on the LCS Program. In response, Mr. Capuco stated that Defendants' vessel design was well advanced and was already undergoing tank tests, thus no input from FastShip would be required.

## V.  The LCS Vessels

51. On November 8, 2008, the U.S. Navy commissioned the USS Freedom (LCS-1), a ship publicly claimed by the U.S. Navy and Lockheed to incorporate a "revolutionary" semi-planing monohull. On September 22, 2012, the Navy commissioned the USS Fort Worth (LCS-3). Eleven additional Lockheed LCS vessels (through LCS-25) are under construction or on order, and the acquisition of additional Lockheed LCS vessels is planned.

52. The Navy also awarded part of the LCS Program to General Dynamics. Its vessels are denominated by even numbers (*e.g.*, LCS-2, -4, etc.) and are not the subject of this suit. The Lockheed vessels are denominated by odd numbers (*e.g.*, LCS-1, -3, etc.).

## COUNT I
## BREACH OF CONTRACT

53. Plaintiff incorporates paragraphs 1-52 above by reference as if more fully set forth herein.

54. FastShip developed expensive and highly valuable Trade Secrets, which it maintained in confidence.

15

55. FastShip and Defendants had valid, binding confidentiality and non-disclosure agreements.

56. FastShip provided the Trade Secrets to Defendants under such confidentiality and nondisclosure agreements.

57. Defendants breached the confidentiality and nondisclosure agreements by improperly and without FastShip's consent using FastShip's Trade Secrets to win and perform the LCS program without FastShip's approval.

58. Defendants have obtained significant benefits from such misuse of FastShip's Trade Secrets, including billions of dollars in current and future revenues on the LCS Program.

59. FastShip was damaged by these breaches of contract.

60. FastShip is entitled to reasonable and entire compensation for these breaches of contract.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS

61. Plaintiff incorporates paragraphs 1-60 above by reference as if more fully set forth herein.

62. FastShip developed expensive and highly valuable Trade Secrets, which it maintained in confidence.

63. FastShip provided the Trade Secrets to Defendants under the confidentiality and nondisclosure agreements.

64. Defendants improperly and without FastShip's consent used FastShip's Trade Secrets to win and perform the LCS program without FastShip's approval.

65. FastShip was damaged by such misappropriation.

66. Defendants have obtained significant benefits from such misappropriation, including billions of dollars in current and future revenues on the LCS Program.

67. Plaintiff is entitled to reasonable and entire compensation for Defendants' misappropriation of trade secrets.

## REQUEST FOR RELIEF

WHEREFORE, FastShip respectfully requests a jury trial and a judgment in its favor against Defendants granting Plaintiff the following relief:

(A) Reasonable and entire compensation for Defendants' breaches of contract and misappropriation of trade secrets, including an ongoing license fee with respect to future LCS vessels, and in an amount to be determined at trial;

(B) Punitive and other enhanced damages:

(C) Plaintiffs' reasonable fees for expert witnesses and attorneys;

(D) Plaintiffs' costs;

(E) Pre-judgment and post-judgment interest on Plaintiffs' award;

(F) Injunctive relief; and

(G) All such other and further relief that the Court deems just or equitable.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all claims in this action.

Date: September 6, 2017              */s/ Raymond H. Lemisch*
                                     KLEHR HARRISON HARVEY
                                     BRANZBURG LLP
                                     Raymond H. Lemisch
                                     10000 Lincoln Drive East, Suite 201
                                     Marlton, New Jersey 08053
                                     Tel: (856) 486-7900
                                     Fax: (856) 486-4875

    Gregory M. Williams (*pro hac* forthcoming)
    Richard W. Smith (*pro hac* forthcoming)
    WILEY REIN LLP
    1776 K Street NW
    Washington, DC 20006
    202.719.7000
    202.719.7049 (fax)
    gwilliams@wileyrein.com
    rwsmith@wileyrein.com


    Donald E. Stout (*pro hac* forthcoming)
    FITCH, EVEN, TABIN & FLANNERY LLP
    1250 23rd Street NW, Suite 410
    Washington, DC 20037
    Tel: (202) 419-7000
    Fax: (202) 419-7007
    Email: dstout@fitcheven.com


    *Attorneys for Plaintiffs, FastShip, LLC and*
    *The Liquidating Trust of FastShip, Inc. Et Al.*